(Nos. 86-CC-1644, 86-CC-1645 cons.–

KIM SUTTER and ELIZABETH FLEMING, Claimants, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed March 19, 1996.*

WISEMAN, SCHAIKEWITZ, MCGIVERN, WAHL, FLAVIN, HESI, BARYLSKE & MORMINO (MARK W. PARKER, of counsel), for Claimants.

JIM RYAN, Attorney General (NUVIAH SHURAZI, Assistant Attorney General, of counsel), for Respondent.

## OPINION

SOMMER, C.J.

On the morning of Saturday, April 21, 1984, shortly before 9:00 a.m., Claimant Elizabeth A. Fleming was operating her 1982 Ford Escort southbound on Illinois Route 3 near the Bissell Street intersection in Madison County. Claimant Kim Sutter was a passenger in the front seat. The driver's sister, Patricia Simpson, was also a passenger. Although it had been raining the night before, Claimant Fleming testified that the weather was fine, although it was misting a bit and was partly cloudy.

The vehicle operated by Claimant Fleming struck water in a southbound lane of Illinois Route 3 and overturned, causing injuries to the Claimants. Claimant Kim Sutter alleges that the accident and her resulting injuries were caused solely by the negligence of the Respondent. Claimant Elizabeth Fleming maintains that the Respondent's agents had notice of the dangerous condition created by water on the highway and did not act with sufficient dispatch to correct the condition or to warn users of the highway of the dangerous condition.

There is no dispute that Illinois Route 3 at the location of this accident was under the jurisdiction of the Illinois Department of Transportation (hereinafter "IDOT")

86

at the time of the accident. Illinois Route 3 at the scene of the accident consists of three 12' northbound lanes and three 12' southbound lanes, both bordered by a 10' stabilized asphalt shoulder. The northbound and southbound lanes are divided by a 6' median with a raised concrete barrier in the middle. From the center of the middle concrete barrier to the outside edge of the stabilized asphalt shoulder the pavement measures 49 feet for both northbound and southbound traffic.

Claimant Fleming testified that as she proceeded south on Route 3 there was nothing obstructing her view, and she was traveling 45 to 50 miles an hour. She testified that she was driving down the road and the next thing she knew the car was out of control and upside down with water pouring through the car. She stated that she never saw the water on the pavement prior to the accident.

The evidence revealed that the Madison Police Department called IDOT at 7:39 a.m. on April 21, 1984, and warned of water on the pavement. Under the heading "Particulars of Communications" an IDOT employee made the following entry as to the communication at 7:39 a.m. from the Madison P.D.:

"WATER ON PAVEMENT IL 3. 300 yards N of Bissell Street in Southeast lane, River Road, highway Route 3 that follows the river at Old Army Depot."

Traffic Operations Engineer George Huhman* was off duty on Saturday, April 21st when he was called by the IDOT dispatcher. Huhman's diary concerning the call recites as follows:

"Received call from Hazel, dispatcher around 7:30 a.m. advising water on pvt. Route 3 in Venice, after talking it over told Hazel did not think it was mine but the City of Venice. Hazel advised would see K. Called back shortly, and I still did not think location was our.

Hazel called back around 8:00 a.m. advised water 1 foot – 2 feet deep on Route 3 near Army Depot, S.B. Lanes. Advised Hazel would (?) would ck. it out."

*George Huhman's name is misspelled as Huemann in the transcript.

Huhman testified that during the first conversation he and the dispatcher, Hazel, discussed the location of the standing water. After the conversation with Hazel, Huhman said he was not sure if the area where the water was located on the highway was or was not in his area. Huhman stated that the dispatcher informed him that she would check on the jurisdiction and get back with him. The dispatcher called Huhman back and spoke to him again about the situation. Huhman has no specific memory of what was said in the second telephone conversation. In any event, after the conversation Huhman still did not believe that the area where the water was sitting was his area of responsibility or IDOT's responsibility, but he also was not sure that the area was definitely not in his area of responsibility. Huhman testified that the diary entry after the first entry related to a third call between him and the dispatcher. It was at that time, about 8:00 a.m., that Huhman claimed that the dispatcher told him water was one to two feet deep, and it was near the Army Depot. Huhman stated that when the dispatcher (Hazel) mentioned that it was near the Army Depot, he was convinced that the water was in his area of responsibility. He advised the dispatcher that he would take care of it. Huhman stated that according to his log he immediately called Kyle Steiner, an IDOT employee, knowing that one to two feet of water on Route 3 would be an unsafe and hazardous condition. Huhman was aware that the speed limit on Route 3 at the subject location was 55 m.p.h.

Huhman contended in his testimony that the radio dispatcher did not give him all of the information recited on her log sheet when she first called him at 7:39 a.m. Huhman admitted that if he had had all the information logged on the radio dispatcher's log sheet, he would have deemed it to be an emergency situation within his jurisdiction that required immediate action. Huhman also

stated that there were IDOT employees who lived closer to the area than the man he called, Kyle Steiner, and that John Gabriel and Larry Widdows lived closer. Huhman explained that there was a union contract establishing requirements for employees who were called out on overtime pay. Huhman testified that IDOT's "normal chain of command" on a call-out situation was to go to the lead worker, who was Mr. Gabriel, but that he must not have been home.

Huhman testified that Hazel Schooler, the radio dispatcher, had a map as to the jurisdiction of IDOT, but Huhman stated that the dispatcher initially did not tell him exactly where the dangerous condition was. Huhman denied that the entries which located the water near the Army Depot on the dispatcher's log accurately reflected the three conversations he had with the dispatcher. Huhman admitted that he had power to deviate from the union contract in emergencies; but that his diary did not show that he had called either Mr. Gabriel or Mr. Widdows. Huhman acknowledged that the dispatcher thought that the area was within IDOT's jurisdiction when she called Huhman.

Kyle Steiner of IDOT testified that at the time in question he was a foreman with IDOT. Steiner did not remember who contacted him on the day in question or what time he was contacted, but stated that after he was contacted he called out Tom Butler to assist him. Steiner did not have coffee, but went out as soon as he could. Steiner did not remember how long it took him to get to the accident scene or what time he left home. IDOT's departmental report reflected that Steiner went 10-8 at 8:26 a.m., which meant that he was going in service. Steiner picked up Butler on Liberty Street in Alton, but did not recall the time. Steiner did not remember whether Butler

was ready when he got there to pick him up or not. Butler's house was closer to the accident than Steiner's house. Steiner's guess was that it would have taken maybe 20 minutes to get to the accident scene from Butler's house. When they arrived at the scene they saw the Claimant's vehicle overturned. There were no warning signs warning motorists of standing water. Steiner and Butler unclogged the drains serving the southbound lanes. Steiner stated that in emergency situations someone could be called who lives closer, and that if he had the information that the dispatcher stated was conveyed to Huhman he would have known that that was within IDOT jurisdiction.

In recent years, this Court has decided similar cases. In *Sallee v. State* (1990), 43 Ill. Ct. Cl. 41, an award was made because the State failed to warn of water on a highway even though it had notice of the defect in question. In *Sallee*, Justice Montana wrote:

"Another difficult issue to resolve in this case, and the one which more often arises in similar cases, is that of negligence. Numerous cases decided by this Court have held that this State is not an insurer as to the safety of motorists or passengers upon its highways. The State is only required to maintain its highways in a reasonably safe condition. In addition, before the State can be held liable for highways which are not maintained in a reasonably safe condition, the State must have notice of the dangerous condition.

This notice requirement has been defined by this Court in numerous cases to be either actual notice or constructive notice. If the State had notice of water standing on the roadway at this location, the State would have been required to either correct that situation or to place warning signs as to the dangerous condition."

Unlike the *Sallee* case, there is no serious dispute in the case at bar that (1) a substantial amount of water had accumulated on the southbound lanes of Route 3 as a result of clogged drains, and (2) at 7:39 a.m., the State had actual knowledge of this emergency dangerous condition. Also, there is no dispute that at the time the Claimants in this case approached the scene of the accident on Illinois Route 3 there were no warnings or barricades of any kind

to alert the Claimants to the presence of this dangerous condition. However, unlike the fact situation in the similar case of *Haggard v. State* (1983), 35 Ill. Ct. Cl. 727, 730, the State did not have any knowledge or notice that the area in question was likely to flood in heavy rain, or that the drainage sewers serving that area of Illinois Route 3 would be likely to clog, or had any time in the past clogged or presented any problems or hazards to traffic. In cases where the State was on notice that a particular area of the highway was likely to flood or become impassible or dangerous due to water standing on the highway, this Court has not hesitated to make awards to compensate Claimants victimized by the dangerous condition created by heavy rainfall of which the State had prior notice. *Haggard, supra.* Also see the exhaustive opinion of Judge Raucci in *Scott v. State* (1990), 43 Ill. Ct. Cl. 85.

Thus, in appropriate circumstances, this Court has repeatedly sustained awards in situations where the State has failed to give warning of dangerous conditions of which it has either actual or constructive notice. *Gatlin v. State* (1985), 39 Ill. Ct. Cl. 51; *Heid v. State* (1991), 44 Ill. Ct. Cl. 82, 87.

Thus, it would appear that the narrow issue which the Court is called upon to decide in the case at bar is whether, under the particular facts and circumstances of this case, the Respondent acted reasonably to discharge its duty to give warning to motorists of a dangerous condition of which the State admittedly had actual knowledge. Claimant Fleming cites Judge Patchett's opinion in *Shaw v. State* (1986), 38 Ill. Ct. Cl. 129, and Justice Holderman's opinion in *Robertson v. State* (1983), 35 Ill. Ct. Cl. 643. Both cases awarded damages to the Claimants injured by dangerous conditions on the roadway. In *Shaw*,

the roadway in question had been dangerous and become progressively worse over a period of almost 2 years with no warning signs posted. (*Shaw, supra,* at 313.) In *Robertson,* the Claimants were injured when their vehicle struck a hole in the road upon which an attempted repair had been made 5 days before the accident. This repair was done in a manner that was not recommended with a temporary patch that was known by the Respondent to be susceptible to failure within a short period of time. No warning signs of the dangerous condition had been erected by the Respondent. This Court found that the State was negligent in having failed to use recommended procedures to properly repair the dangerous condition and having failed to warn motorists of the dangerous condition of the roadway.

Claimant Fleming also cites *Allen v. State* (1984), 36 Ill. Ct. Cl. 242. In *Allen,* this Court denied relief to a motorcyclist who was injured when he lost control of his motorcycle. The motorcyclist contended that a patched area in the highway had caused him to lose control. In *Allen,* Justice Roe found that the Claimant had failed to meet his burden of proof, and that he had failed to show that the patched area of the highway was so defective and dangerous that it left the highway unfit for the purpose for which it was intended, or that the highway was not reasonably safe. IDOT employees testified that the area in question had been repeatedly examined and repaired using state maintenance standards. *Shaw, Robertson,* and *Allen* do little to support the theory of Claimant Fleming in the case at bar.

Claimant Fleming also relies on *Haggard* and *National Bank of Bloomington v. State* (1990), 34 Ill. Ct. Cl. 23, which, nearly identical to *Haggard,* held an award justified where the evidence indicated that a flooding condition

over a roadway was a recurring condition and it was the practice of the State to place temporary warning signs whenever water accumulated. In *National Bank of Bloomington*, there was evidence that the dangerous condition at the site of the accident had existed over a period of 28 years, and that on occasion the State had placed temporary lighted signs to warn motorists, which were not present when the accident happened.

Finally, Claimant Fleming offers *Interstate Bakeries v. State* (1974), 29 Ill. Ct. Cl. 446. In *Interstate Bakeries*, it was claimed that the Respondent had failed to remove an accumulation of oil from the highway which caused an accident injuring the Claimant. The evidence indicated that the accident occurred on September 26, and that, as early as September 4 of the same year, the State had been notified by residents of a nearby village that oil was accumulating on the road and creating a dangerous condition. In fact, the Respondent had dispatched a maintenance crew to the site and had previously scraped excess oil off of the road. The condition was caused by oiling of the village roads adjacent to the highway. No warning signs were ever placed at the location where oil accumulated. This court held that the State had actual notice on September 4, 1966, of the dangerous condition prior to the accident on September 26 of the same year. An award was made in the face of evidence that the State's maintenance crews had been to the site three to five times. The Respondent knew that the condition was a recurring one, and although the Respondent made efforts to repair the situation, the recurring nature of the situation was found to have placed the State on notice that its maintenance was ineffective and that warnings alerting motorists of a possible accumulation of oil at the intersection should have been posted. Again, *Interstate Bakeries* offers little support for the proposition that a reaction time of less

than 2 hours on the part of the State to a known dangerous condition is unreasonable or negligent.

The two cases cited on behalf of Claimant Sutter, as to the liability issue are not helpful.

In *McCoy v. State* (1985), 37 Ill. Ct. Cl. 182, 185, the Court denied any award in the situation where the Claimant drove his automobile through a safety zone marked by flares and collided with a tow truck whose flashing lights were revolving. Also present were the flashing blue lights of a police car and a paramedics' vehicle at the scene of an accident. The Respondent was found free from negligence in attempting to clear away the wreckage of an accident.

In *McKee v. State* (1978), 33 Ill. Ct. Cl. 58, 61, the Court allowed an award to a motorcyclist whose vehicle had struck a hole in a highway. The evidence revealed that a sewer line had been placed under the highway about a year prior to the accident, and that work had been done in that area almost yearly. State police officers noticed the depressed area where the accident occurred getting worse during the day, but did not believe the situation sufficiently bad to report to IDOT. The State placed no warning signals or barricades at the scene to warn motorists. Additional evidence was adduced that the Respondent had been patching the street in that area over a long period of time. The tendency of the highway to develop holes or dangerous conditions had apparently been caused by an improper auguring process used to install a sewer under the highway. The Court found that the State had continually had trouble with that stretch of roadway requiring repeated repairs and that the State had not properly fulfilled its duty in supervising the auguring under the highway, which created the dangerous condition. This Court concluded that the State had constructive notice of the dangerous condition, and thus, granted the injured Claimant an award.

Both Claimants argue long and hard that the facts in this case justify the conclusion that the State was negligent in failing to properly respond to a known dangerous emergency situation which had developed on Illinois Route 3 when drainage guttering had been unexpectedly blocked by debris. Claimant Sutter complains that, had engineer Huhman acted more quickly or assigned responsibilities to IDOT employees who lived closer to the scene, the accident would have been avoided. It should be remembered that Huhman was contacted by his dispatcher at 7:39 a.m. on a Saturday, and called Steiner who left his home at approximately 8:26 a.m. to pick up IDOT employee Don Butler in Alton and proceed to the scene, arriving sometime shortly after 9:00 a.m. It should be remembered that Huhman testified that he was uncertain from the description he got from the radio dispatcher as to whether or not the problem existed in an area of the highway under the jurisdiction of IDOT. Thus, he did not know whether he had jurisdiction until 8:00 a.m. Huhman claims that he followed weekend work assignment procedures required by IDOT's protocol and by union contracts, but did not deny that he had the power to deviate from normal procedure in emergency situations. Claimant Fleming argues that Huhman should have contacted other agencies or emergency personnel to place warning signs or divert traffic.

The arguments of both Claimants hang on a simple question with no simple answer—Did IDOT respond with reasonable dispatch to an unexpected emergency highway condition within its jurisdiction?

Claimant Fleming asserts that she was a 25-year-old woman, pregnant and expecting her third child at the time of the accident. The child was delivered by C-section four months after the accident. She was told by her

physician not to work from the time of the accident until the birth of the child. She claims to have missed four months of work at $300 a week; and, as a result of the C-section delivery, she missed an additional month that she would not have missed had her third childbirth been normal. Her vehicle was totaled and had a value of approximately $4,100. She lists damages as follows:

| Item | Amount |
|------|--------|
| Lost vehicle | $4,100.00 |
| St. Elizabeth's Hospital | 300.00 |
| Ambulance bill | 160.00 |
| Dr. Yoder | 600.00 |
| Wage loss | 6,000.00 |
| Total.................... | $11,160.00 |

Claimant Fleming seeks an award of $15,000.

Claimant Sutter contends that she suffers from permanent injuries, and has had "constant middle and lower back pain." Chiropractor Lawrence Seger diagnosed Claimant Sutter as having suffered an "acute severe sprain of the thoracic and lumbar spine with accompanied ligamentis instability, mild myofascitis and localized evidence of nerve root irritation." Dr. Seger opined that the injuries were caused by the accident and would last throughout Claimant Sutter's life expectancy of 46.3 years. Claimant Sutter lists medical expenses incurred and paid of $4,587 and seeks an award of $54,587.

The Respondent has cited 13 decisions, many of which are of little assistance. Among those cases cited is *Pyle v. State* (1973), 29 Ill. Ct. Cl. 133. In *Pyle,* the Court dealt with a problem involving a stop sign that had been knocked down at an intersection. The Claimant brought suit on the theory that the State was negligent in failing to replace the downed stop sign within a reasonable time after

having actual notice of the dangerous condition. In a lengthy opinion authorized by Justice Burks, this Court reviewed a number of cases from both Illinois and other jurisdictions on the question of whether the State failed to take appropriate remedial action within a reasonable length of time after having actual knowledge of the dangerous condition on its highway. The evidence in *Pyle* was not disputed. The dangerous condition was first discovered by an Illinois State trooper 29 hours before the Claimant's accident. The Court agreed that, at the time that the Illinois State trooper observed the dangerous condition, the State was chargeable with actual knowledge. The Court then identified the issue which this Court believes is the narrow issue, upon which the present case turns, as follows:

"We turn next to the question as to what length of time constitutes a "failure" on the part of the State to take appropriate remedial measures after receiving notice of a downed stop sign." (Dangerous condition on the highway). *Pyle*, at 137.

The Court ruled that the answer to the above question depended on the facts and circumstances in each particular case. The Court held that Respondent's failure to repair the condition or to erect warning signs over a period of 29 hours after actual notice could not be ruled to be negligence on the part of the Respondent, primarily because other signs were present.

The issue, exhaustively reviewed by this Court in *Pyle*, is not materially different than the issue before the Court in this case, even though most of the cases cited in *Pyle* involved downed stop signs. At least one case involved a hole in the highway. (*Caudle v. State* (1949), 19 Ill. Ct. Cl. 35.) In *Caudle*, the State had a four or five day notice that a hole existed in the highway, yet liability was not imposed.

In the present claim, it was a Saturday—a day in which most IDOT employees were off work. At 7:39 a.m., Mr. Huhman received a call from the dispatcher concerning the water on Route 3. It took 20 minutes, until 8:00 a.m., to locate the water within IDOT's jurisdiction. Mr. Steiner was called at 8:00 a.m. He got dressed, but did not drink or eat, and went out at 8:26 a.m. He picked up Mr. Butler directly on the way to the water on Route 3. He did not go to the yard or headquarters first. Mr. Steiner and Mr. Butler arrived at the scene at approximately 9:00 a.m. The accident occurred shortly before 9:00 a.m.

The Claimant argues that, had there not been the confusion between Mr. Huhman and the dispatcher as to the location of the water, and had a closer lead worker been called out, the accident would have been prevented by the earlier arrival of the IDOT crew.

As we have stated previously, the length of time required to remediate a known dangerous condition depends upon the circumstances.

It is easy to speculate that the radio dispatcher employed by IDOT or the traffic engineer for IDOT could have reacted to evidence of the dangerous condition in a more timely, imaginative, or heroic fashion, but the precedents do not require such. So long as the IDOT employees conducted themselves in a reasonably diligent manner in relation to the known hazard and circumstances, we cannot hold them to a greater duty.

In the present claim, one to two feet of water was reported on Route 3. It was necessary for IDOT to locate the water and locate a crew to be dispatched to the scene. The crew had to prepare themselves to go out and then travel to the scene. All this took one and one-half hours on a Saturday. We find the response of the State to have

98

been reasonably diligent under the circumstances and, therefore, the State did not breach its duty and was, thus, not negligent.

It is the ruling of this Court that the claims of both Claimants are denied.